## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **LINDSEY EVANS,**<br><br>          **Plaintiff,**<br><br>vs.<br><br>**GLYMED PLUS LLC,**<br><br>          **Defendant.** | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:23-CV-27-DAK-DBP<br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Dustin B. Pead |

This matter is before the court on Defendant GlyMed Plus LLC's Motion for Partial Summary Judgment [ECF No. 36]; Plaintiff Lindsey Evans's Motion for Partial Summary Judgment Regarding Plaintiff's Contract Claims [ECF No. 38]; and Defendant's Motion in Limine to Exclude Testimony Regarding Unrelated Discriminatory Acts [ECF No. 51]. On October 1, 2025, the court held a hearing on the motions. At the hearing, Plaintiff Lindsey Evans was represented by Loren K. Peck, and Defendant GlyMed Plus LLC was represented by David P. Williams and Scott A. Wiseman. The court took the motions under advisement. After considering the parties' arguments and the law and facts relevant to the pending motions, the court issues the following Memorandum Decision and Order.

## BACKGROUND

Plaintiff Lindsey Evans was a sales account manager for Defendant GlyMed from October 2018 to December 2021. GlyMed sells professional skin care products nationwide under the brand name GlyMed+. Sales account managers sell the products to customers and third-party retailers.

In 2018, GlyMed sent Evans an Offer Letter summarizing a proposed compensation

structure, including a commissions component. Evans accepted the offer of employment outlined in the Offer Letter. From October 2018 to December 2020, the Offer Letter was the only document that outlined Evans' commission-based compensation structure. The letter provided that Evans was a "non-exempt" status being paid "straight commission," with a monthly guarantee of $3000 if sales minimums were not met. The letter further summarized the commissions Evans would be paid, listing "8% paid on all sales in your assigned territory," "10% paid on all sales in the months that you increase sales by 25% to 39.9% over the same month from the previous year," "12% paid on all sales in the months that you increase sales by 40% or more over the same month from the previous year," and an additional 2% on all sales during the first thirty days of new accounts."

From October 23, 2018, until the end of 2020, Evans alleges that GlyMed paid her only half of the commissions she was supposed to receive on retail sales in her territory, effectively paying her 4%, 5%, and 6% instead of 8%, 10%, and 12%. Evans claims that GlyMed categorized sales as "pro sales" or "retail sales," and paid lower commissions for retail sales. Also, when considering whether Evans's sales increased over the same month in the prior year, GlyMed included only pro sales in the comparison and did not include retail sales.

Effective January 1, 2021, GlyMed introduced a new compensation structure in a policy titled "GlyMed Plus – 2021 Account Manager Sales Commission Policy." The 2021 Policy allowed GlyMed to make certain modifications to the agreement at its sole discretion. Between January 1, 2021, and November 30, 2021, GlyMed reduced Evans' commissions by 2% when GlyMed's executive team determined that there was a large account and that GlyMed had offered a large discount.

On October 20, 2021, Evans gave birth to a child and began to take "maternity leave."

2

GlyMed does not have, and has never had, a paid or unpaid maternity leave policy. Prior to August 2021, GlyMed's policy for paid employee leave consisted solely of "Paid Time Off" ("PTO"), which every employee accrued based on years of service. PTO was to be used for vacation, sick leave, and other personal needs. In addition to this PTO, GlyMed had a policy providing for unpaid personal leave upon management approval, which was not to exceed twelve weeks per year. Prior to Evans's maternity leave, on August 25, 2021, GlyMed modified its leave policy to include separate accruals for paid vacation time and paid sick time. It also updated its unpaid personal leave policy to limit it to 10 days (two work weeks). GlyMed notified its employees of these changes to the leave policy in an email, dated August 25, 2021. Evans, along with all other employees, received this email. Evans emailed this email to her personal email account the following day, August 26, 2021.

Despite the revised policy and the continued lack of any formal maternity leave, Evans took approximately four weeks of leave after the birth of her child. Evans did not formally request the leave from Human Resources. Rather, Evans claims that her direct supervisor permitted her to take leave for up to twelve weeks, although she took leave from October 20, 2021, to November 24 or 28, 2021.[1] Evans alleges that her direct supervisor communicated to her and another pregnant sales account manager that he had spoken to the president of the company, Jon McDaniel, and the two sales account managers could take twelve weeks of maternity leave and that they would earn commissions on sales in their territories as usual during that leave. The other account manager, Vidal, received an email from the supervisor documenting the leave. However, Evans alleges she spoke with her supervisor in person. Her supervisor believes that is correct.

---

1  There is a dispute as to whether Evans's leave included the Thanksgiving weekend.

GlyMed paid Evans commissions for sales in October 2021 as usual. However, Evans alleges that GlyMed paid her only 50% of her the sales commissions she earned in November 2021. Evans alleges that the sales that occurred during November were due to work she put in before she took leave and work she continued to do while she was on leave. She states that she was responsive to clients throughout her leave. Both Evans and the other pregnant account manager had their commissions cut by half for the time that they were out on leave. No other employee earned commissions on their accounts while they were on leave. The fifty percent commission, therefore, was retained by the company.

Both sales account managers complained to GlyMed's president Jon McDaniel because their supervisor had told them that McDaviel had approved the leave. The other sales account manager had an email from the supervisor who agreed to the time off, whereas Evans did not. Evans and the supervisor verbally agreed that Evans would be treated the same as Vidal. Because of the email documentation, the other sales account manager was given her full commissions when she complained. However, GlyMed does not acknowledge that Evans's supervisor gave her verbal approval to take leave under the same conditions as the other sales account manager. Instead, GlyMed argues that Evans was subject to GlyMed's unpaid leave policy for time off and that any unpaid leave would result in Evans not receiving commissions during that time period, even if she had earned those commission through her own work before and while she took leave.

Evans sent an email to GlyMed's President Jon McDaniel on December 21, 2021, telling him that her paycheck was incorrect because of the fifty percent reduction to her commissions in November. Evans stated that she believed she should have been paid in full during her leave according to the communications she had with her supervisor. McDaniel responded that GlyMed does not offer extended paid leave to any employee and summarized the parental leave policy the

4

company was considering, concluding that in a spirit of good will, GlyMed would pay her fifty percent of what she would have otherwise earned during that period. McDaniel did not come to an agreement with Evans, and Evans resigned the next day. GlyMed acknowledged her resignation in a letter it sent to her on December 23, 2021.

Evans filed a charge of discrimination with the EEOC on March 8, 2022, alleging primarily pregnancy discrimination on the basis of not being paid during her leave. After receiving a right to sue letter, she filed this action. Evans alleges four causes of action: pregnancy discrimination and three other state law claims for breach of contract and violation of the Utah Payment of Wages Act ("UPWA"). Evans claims that one-half of her pay was withheld, that she was assigned a less favorable territory, that she was required to travel which would be difficult for her, and that GlyMed delayed transferring her phone while she was on leave.

### DISCUSSION

### GlyMed's Motion for Partial Summary Judgment

GlyMed seeks summary judgment on Evans's pregnancy discrimination claim and portions of her contractual and statutory claims for payment of wages. If GlyMed is entitled to summary judgment on Evans's pregnancy discrimination claim, the court would not have supplemental jurisdiction over the state law claims. The court, therefore, will first address the pregnancy discrimination claim.

### 1. Pregnancy Discrimination Claim

GlyMed moves for partial summary judgment on Evans' pregnancy discrimination claim, arguing that she cannot show that she was treated less favorably than other employees who were not pregnant. Title VII, as amended by the Pregnancy Discrimination Act, prohibits discrimination on the basis of pregnancy, childbirth, or related medical conditions and requires

that women affected by pregnancy, childbirth, or related medical conditions "be treated the same for all employment-related purposes." *Horizon/CMS Health Care Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000) (quoting 42 U.S.C. 2000e(k)). Pregnancy discrimination can be proven through direct evidence or indirect evidence. *Stover v. Martinez*, 382 F.3d 1064, 1075 (10th Cir. 2004).

Evans contends that she can prove pregnancy discrimination in this case by direct evidence. Direct evidence of discrimination includes a decision-maker's "statements demonstrating [his] discriminatory motivation." *Stover*, 382 F.3d at 1075-76. Direct evidence is "evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1154 (10th Cir. 2008). In this case, Evans claims that GlyMed withheld $30,785.27, which was half of every commission Evans earned in November 2021. GlyMed's president, Jon McDaniel, made the decision to divert these earned commissions to company earnings because Evans took leave. In connection with this decision, McDaniel made statements and gave directions that directly link GlyMed's withholding of commissions to Evans' use of leave for pregnancy-related conditions. McDaniel allegedly instructed the vice president over finance to calculate the full month of Evans's November 2021 commissions and then cut it by 50 percent. The reason was Evans' use of leave in November 2021 due to the birth of her child. McDaniel's instruction was reduced to writing in Evans's commission breakdown: "Commission—calculated at 50% due to extended leave."

The court agrees that withholding her earned commissions was a materially adverse employment action. Any definition of "adverse employment action" includes "monetary losses in the form of wages or benefits." *Neri v. Bd. of Educ.*, 860 F. App'x 556, 565 (10th Cir. 2021). GlyMed suggests that withholding commissions from Evans was not adverse because Evans was on "unpaid leave" and, therefore, not entitled to any wages. But this argument ignores the

evidence in the record, which the court must view most favorably to Evans, that Evans' direct supervisor promised Evans that she would continue to earn commissions as usual during maternity leave. In addition, commission-based employees are compensated based on results agreed to in a commissions agreement, not time in the office.   *See, e.g., Zeffro v. Gillen*, 2001 PA Super 336, ¶¶ 10-15, 788 A.2d 1009. As long as the employee meets the conditions in the agreement, the commissions are earned and payable. Using the terms paid and unpaid leave do not dictate a commission-based employee's compensation. Non-hourly employees are entitled to their full promised compensation under the agreement unless the agreement provides otherwise. An exception could exist if commissions are contingent on attendance, but in this case, attendance was not a prerequisite. GlyMed's insistence on the "unpaid leave" label does not relieve it of its obligation to pay Evans her commissions under the agreement or to make its failure to pay her less of an adverse action.

With direct evidence, the causal link between discriminatory motive and adverse employment action must be apparent from the evidence itself. McDaniel's statements to the vice president and the vice president's recording of his instruction plainly state that Evan's commissions were calculated at 50% due to her extended leave. Evans argues that GlyMed appears to use the term "extended leave" as another way of referring to Evans' pre-approved maternity leave. But that argument takes this case out of the direct evidence type of discrimination claim and puts it in the indirect evidence type of discrimination claim. Evans appears to be correct that the term "extended leave" is not found in any GlyMed policy. But the question of fact about what would constitute extended leave does not directly prove discrimination. A lack of direct evidence does not doom a plaintiff's claim. *Fassbender v. Correct Care Sols.,* LLC, 890 F.3d 875, 884 (10th Cir. 2018). When indirect or circumstantial

evidence is the basis of a Title VII claim, courts "evaluate the evidence under the *McDonell Douglas* framework." *Id.*

Under the *McDonnell Douglas* burden-shifting framework, Evans bears the burden of establishing a prima facie case by a preponderance of the evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). The parties appear to agree that Evans was part of a protected class under Title VII and entitled to Title VII protections when she became pregnant, gave birth, and recovered from her caesarean-section surgery. The only disputed element of a prima facie case, therefore, is whether Evans can show that she was treated less favorably than others who were not pregnant. *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019). The key inquiry is whether Evans can demonstrate an adverse employment action that "occurred under circumstances which give rise to an inference of unlawful discrimination." *Id.*

In support of her claim that she was treated less favorably than someone who was not pregnant, Evans claims that GlyMed withheld one-half of her pay, that she was assigned a less favorable territory, that she was required to travel which would be difficult for her, and that GlyMed delayed transferring her phone while she was on leave. Evans has not provided sufficient evidence to survive summary judgment on her claims that she was treated differently with respect to the territory she was assigned., the travel requirements, or the delay in transferring her phone while she was on leave. Therefore, the only remaining issue is whether she was disparately treated when her commissions were cut in half. The court has already found above that withholding half of her earned commissions was an adverse employment action.

The parties disagree factually on whether GlyMed pre-approved Evans' request for leave and the terms of that leave. GlyMed does not acknowledge any of the evidence supporting Evans's position. But there is evidence in the record supporting a finding that Evans's supervisor

8

gave her permission to take a twelve-week leave, even though she ultimately only took four weeks, and earn commissions during the leave. Evans's supervisor testified that it was his belief that commission-based employees would still earn commissions they had already earned while they were on leave. There is evidence that the commissions were from work Evans did before she took leave and that she continued to deal with clients during her leave. It is not a situation where someone else did the work to earn the commissions.

GlyMed argues that Evans's supervisor testified only that it was his "belief" that he communicated this information to Evans, later clarifying that he "probably did." The supervisor said he had to guess and could only "assume" as to how this information was communicated because he could not specifically recall it. But this type of evidence is what needs to go before a jury. This court cannot make credibility determinations or weigh the evidence on summary judgment. The evidence exists and it needs to be considered by the finder of fact at trial.

GlyMed also contends that the supervisor admitted in his deposition that he had no authority to approve decisions related to parental leave. But there is evidence that he communicated to the account managers that the president of the company had approved it. Moreover, GlyMed relied on his email to the other account manager to approve the payment of her full commissions. The fact that he now acknowledges that he does not have authority to approve leave does not change what happened with Evans and the other account manager. It is undisputed that the supervisor sent an email to the other account manager documenting the agreement and GlyMed kept its agreement with that employee. It is not a situation where GlyMed can argue that the agreement was made by a rogue supervisor, there is no proof of such an agreement, and it is not abiding by his agreements. It already agreed to honor the exact agreement with the other employee.

9

Looking at the facts in a light most favorable to Evans, once Gly-Med approved her requested leave, GlyMed was prohibited from treating her differently than similarly situated employees who were granted leave for non-pregnancy reasons. At the relevant time, GlyMed employed three "inside" account managers who were all commission-based, operated under the same standards, and reported to the same supervisor. GlyMed employed a handful of "outside" account managers, including the other pregnant account manager, who were also commission-based and shared the same supervisor. At the same time as Evan's caesarean section and maternity leave, the other two inside account managers each used approved leave for nonpregnancy issues, including illnesses, vacation, moving, and surgery, without any commissions being withheld. GlyMed only reduced commissions for the two account managers who used the leave for pregnancy-related conditions.

With regard to withholding the commissions Evans earned, GlyMed argues that Evans cannot demonstrate that she was treated differently than other employees because it does not have a long-term leave policy for any employees. Evans, however, argues that genuine issues of material fact precluding summary judgment on the pregnancy discrimination claim because her supervisor approved of the leave with paid commissions, but the company then claimed that she took an extended leave that had to be fully unpaid and precluded her from getting commissions. The commissions agreement does not state that Evans had to be present at work to be paid the commissions she earned, and it is unclear how the leave policy coexists with the commissions agreements. Evans submitted declarations from other non-pregnant account managers stating that GlyMed did not withhold commissions from them when they used pre-approved leave for things such as weddings and surgeries. While it is not clear whether the non-pregnant account managers were out for as long as four weeks, there is a question as to whether GlyMed treated Evans

differently than these non-pregnant account managers. There is evidence that Evans continued to do some work while she was on leave and that no other employee did the work to earn the commissions.

GlyMed asks the court to define "similarly situated" so narrowly that Evans and the other pregnant account manager are left in a class of their own because these women used more leave than other account managers. But courts have routinely rejected employers' attempts to avoid a meaningful comparison by defining away similarly situated employees. In *EEOC v. Ackerman, Hood & McQueen Inc.*, a pregnant employee requested schedule modifications, and the employer argued that similarly situated employees should not include all employees who had requested leave or schedule adjustments, only employees whom a doctor had certified were in good health like the plaintiff, even though such an argument left no other employes. 956 F.2d 944, 948 (10th Cir. 1992). The Tenth Circuit found the employer's argument "unconvincing" and considered all employees who requested leave or schedule adjustments. *Id.*

In this case, GlyMed uses the term "extended leave" to insulate Evans from comparison with other account managers. The court finds this an overly restrictive definition, especially since she was out on leave for only four weeks. It is possible that an employee could be out for that period of time with any serious surgery. Considering all account managers who took pre-approved leave, there is evidence that a reasonable jury could find that Evans was treated less favorably than similarly situated account managers who used leave for reasons other than pregnancy. The other account manager who took maternity leave ultimately received her full commissions because she had an email documenting the agreement. Evans does not have an email, but she has her own testimony and her supervisor's testimony that should be considered by a jury. There is an underlying question of fact about the approved leave, the treatment of

11

others who were also given approved leave, and whether employees who took leave for pregnancy related conditions were treated differently. This creates a genuine issue of material fact that precludes summary judgment on Evan's pregnancy discrimination claim.

Evans also argues that she has presented sufficient evidence of discrimination based on a hostile work environment theory. However, none of the allegations she refers to were pervasive or severe enough to reach the level required for such a claim. Therefore, her allegations do not support a hostile work environment claim that can survive summary judgment.

Evans also argues that GlyMed's reasons for withholding her commissions are not credible. She claims that GlyMed's original reason for withholding her commissions were captured in an email exchange between Evans and McDaniel in December 2021. McDaniel told Evans that GlyMed was operating under a Parental Leave policy that GlyMed has since conceded was never put in place. McDaniel also said that GlyMed does not offer full paid leave to any employees. Evans argues that his statement might be true for hourly employees, but that is no reason for withholding commissions earned under a commissions agreement. Other account managers took leave without commissions being reduced and there is no evidence that Evans's commissions were contingent on attendance. McDaniels acknowledged that Evans' direct supervisor had made "one-off promises" with employees regarding maternity leave and that GlyMed was "navigating each and every one of these one-off promises." The other account manager ultimately received her full commissions based on the supervisor's promises that were in an email. Evans's supervisor testified that he gave the same promise of commission payments during maternity leave to Evans and that it was his understanding that a commission-based employee would receive earned commissions while on leave. Given the changing nature of GlyMed's arguments as to why Evans was denied her full commissions, the court concludes

that a there is a question of fact that should go to the jury as to whether GlyMed's proffered reasons are unworthy of credence.

For the above reasons, when viewing all the evidence in the light most favorable to Evans, the court concludes that genuine issues of material facts make summary judgment inappropriate on Evans's pregnancy discrimination claim. A jury needs to consider and weigh the evidence. Accordingly, the court denies GlyMed's motion for summary judgment on that claim.

### 2. Unpaid Wages Claims

GlyMed argues that Evans' claim for unpaid wages under the Utah Payment of Wages Act ("UPWA"), does not allow her to get attorneys' fees or penalties even if she is successful on them. GlyMed seeks summary judgment on Evans' claim for attorney fees under Utah Code Ann. § 34-27-1 and on Evans' claim for the penalty provided for in the UPWA, *id.* 34-28-5(1)(c). Section 34-27-1 provides attorneys' fees to an employee who is successful on a claim for unpaid wages, contingent upon the employee making a written demand for wages at least 15 days before bringing suit. Section 34-28-5(1)(c) provides for a penalty of 2.5% per day for up to 60 days, contingent upon a written demand for the unpaid wages and commencing an action within 60 days of the date of separation.

However, the parties agree that remedies under the UPWA do not apply to wage claims based upon written agreements. The Utah Supreme Court has found that the language in the UPWA does not apply to employees subject to a written commissions agreement because the employee has a remedy under a breach of the agreement. *Action Electric v. Industrial Comm'n of Utah*, 636 P.2d 474, 475-77 (Utah 1981). Evans states that she asserted the UPWA claim because GlyMed had been denying that there was a contract. GlyMed does not appear to be

disputing that there is a contract controlling the payment of Evans' commissions. Therefore, the parties agree and the court concludes that the UPWA does not come into play to the extent that the parties agree there is contract between them.

To the extent that there may be a dispute between the parties as to whether Evans made a demand in writing pursuant to Utah Code Ann. § 34-27-1, the court agrees with Evans that she made an adequate demand with respect to payment of her full November commissions. Evans' email to McDaniel was a written demand for full payment of her November commissions. The email notified McDaniel that the commission amount she had been paid was incorrect and contrary to what her supervisor told her would be the case. Evans asked McDaniel to correct the pay issue as soon as possible, which was a demand that she be paid the full amount of commissions. McDaniel's response showed that he understood what commissions she was referring to in her email. Evans then responded to McDaniel: "I am going to need my pay corrected in full as agreed upon as soon as possible." This demand was an insistent and forceful demand with respect to a known sum of money. The fact that she is now asking for more unpaid wages does not change the fact that she made a clear request for a certain sum in the email. Therefore, the court finds that she made an adequate demand for payment of her full November commissions. To the extent that the UPWA could apply in the event of no contract, Evans meets the demand requirements of the statute.

Because there are questions of fact regarding the pregnancy discrimination claim and the parties agree that the UPWA does not apply if there is a contract between the parties, the court denies GlyMed's Motion for Partial Summary Judgment.

### Evans' Motion for Partial Summary Judgment

Evans moves for summary judgment in her favor on portions of her breach of contract

14

claims, specifically the elements of contract formation, interpretation, and breach. While Evans concedes that materiality of the breaches and damages are not at issue in this motion, she advances three events that she contends are breaches of the agreements: (1) GlyMed's payment of commissions regarding retail sales; (2) GlyMed's payment of commissions regarding NB Aesthetics; and (3) GlyMed's payment of commissions during November 2021 when Evans was on leave. GlyMed argues that there are disputed issues of material fact that preclude summary judgment on Evans' contract claims. Because Evans is moving for summary judgment on these issues, the court must view all relevant evidence in the light most favorable to GlyMed.

Evans contends that the 2018 Offer Letter formed the first agreement regarding compensation between Evans and GlyMed and that GlyMed breached the agreement by failing to pay her commissions on all sales and all orders. However, Offer Letter does not define "all sales" and "all orders" and the parties dispute how they should be interpreted. Evans claims that GlyMed allegedly breached the agreement because it did not consider "all sales" when performing the comparison of sales against the year prior. Instead, GlyMed only considered "pro sales" when performing that comparison. Pro sales were just one category of sales. Retail sales were not considered even though they allegedly should have been part of all sales and all orders. Based on these undisputed facts and the unambiguous language of the 2018 Offer Letter, Evans asserts that GlyMed's failure to pay the promised commissions on all sales and all orders in Evans' territory were breaches of the parties' compensation agreement.

GlyMed, however, points out that the 2018 Offer Letter is not an integrated contract. Utah courts have held that, "in the absence of an integration clause, when a party to a contract insists that the contract is not integrated, a court must determine as a question of fact whether the writing constituted a final and complete expression of their bargain." *City of Grantsville v.*

15

*Redevelopment Agency of Tooele*, 2010 UT 38, ¶ 24, 233 P.3d 461. In this case, the Offer Letter appears to contain a summary of a job description, compensation/benefits, other terms of employment, and explains that Evans will have to sign additional documents.

GlyMed contends that the Offer Letter is facially ambiguous, for example, when it states "8% paid on all sales in your assigned territory." Evans' territory cannot be discerned from the Offer Letter and neither can the term "all sales." It is unclear whether "all sales" means profits, revenue, gross receipts, or something else. While Evans correctly states that "all sales" does not discern between specific GlyMed products, the operative dispute is what dollar figure—profit, revenue, or gross receipt is utilized when measuring a sale. Therefore, the court agrees with GlyMed that the language in the Offer Letter is a guide that requires parole evidence and evidence regarding the parties' subsequent practices.

When GlyMed makes a "pro sale" directly to skincare professionals, it receives 100% of the revenue associated with the sale. When GlyMed makes a "retail sale" where it allows others to create their own storefront and sell to end users, GlyMed only receives 60 percent of the revenue. However, the receipt for a retail sale shows the retail price which the consumer paid, not the revenue GlyMed received from the sale split with the seller. According to Evans, she is entitled to 8%, 10%, and 12% of gross receipts—not revenue. GlyMed asserts that this could hypothetically make sense in a business where gross receipts were equivalent to revenue, but it would lead to absurd results in a business model like GlyMed's. It does not make sense that Evans would be entitled to a $10 commission on a $100 pro sale and also be entitled to a $10 commission on a $100 retail sale where GlyMed makes only $60 in revenue. The court agrees with GlyMed that there is a question of fact as to whether the Offer Letter should be interpreted to mean that Evans is entitled to a commission equal to the revenue collected from all sales or

16

gross receipts. "All sales" is ambiguous enough that GlyMed gives a reasonable interpretation that all sales means all sales revenue GlyMed receives. GlyMed is not arguing for only profits—Evans mischaracterizes GlyMed's argument and then shoots it down. There is not enough evidence to rule as a matter of law as to how the 2018 Offer Letter should be interpreted or as to whether GlyMed breached the 2018 Offer Letter.

In addition to the questions regarding contract interpretation, there is a dispute of fact as to whether the parties' subsequent conduct modified the terms of the Offer Letter such that Evans was only entitled to receive commissions for retail sales calculated by using 50% of the rate of full commissions for pro sales. GlyMed states that there is evidence that it paid Evans this way for years. Evans had access to the underlying data showing how her commissions were calculated each month, and Evans never objected to this computation of commissions until well after her employment ended.

"Parties to a contract may, by mutual consent, modify any or all of a contract." *Tech Ctr. 2000, LLC v. Zrii, LLC*, 2015 UT App 281, ¶ 13, 363 P.3d 566. "A valid modification of a contract or lease requires a meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient definiteness." *Id.* Whether a modification occurred is a question of fact. *Colonial Pac. Leasing Corp. v. J.W.C.J.R. Corp.*, 1999 UT App 91, ¶ 27, 977 P.2d 541. Because the issue of contract modification is fact-intensive, summary judgment is often inappropriate. *See Ron Shepheard Ins. v. Shields*, 882 P.2d 650, 656 9Utah 1994).

In this case, there is an issue of fact as to whether the parties modified the terms of the Offer Letter such that Evans was only entitled to receive commissions for retail sales at 50 percent of the rates of full commissions for pro sales. Since the inception of Evans' employment, only 50 percent of retail sales counted toward the commissionable base. That practice was

expressly confirmed in the 2021 Commission Policy. At all times during Evans' employment, she had access to sales data in her territory and information regarding the calculation of her commission. Despite this, she did not raise any issue with how commissions on retail sales were calculated during her employment at GlyMed. There is sufficient evidence from which a jury could find that GlyMed and Evans modified the terms of the Offer Letter through their conduct. The court finds that the jury is entitled to consider all of this evidence in determining Evans's breach of contract claims related to the Offer Letter. Accordingly, the court denies Evans's motion for summary judgment on interpretation and breach of the Offer Letter.

The parties agree that the 2021 Compensation Policy governed the parties' compensation agreement as of January 1, 2021. The Policy introduced quotas and defined certain terms, including commission base. Evans accepted the new compensation structure and continued to work for GlyMed. It is undisputed that the evidence establishes offer, acceptance, and consideration for the 2021 Policy. Evans argues that the court should find that GlyMed breached the terms of the 2021 Policy because it sometimes reduced some of Evans' pro sales by 2% before adding them to her Commission Base. GlyMed did this whenever GlyMed's top executives determined that a sale had been made in connection with a "large" account. Evans argues that nothing in the 2021 Policy allowed for this kind of reduction and GlyMed's practice was contrary to the unambiguous terms of the parties' agreement.

GlyMed argues that there is also a dispute of fact as to contract modification with respect to the 2021 Policy. Evans claims that GlyMed's policy to reduce the amount of commissions paid to her on sales made to NB Aesthetics by 2% constituted a breach of the 2021 Policy. But the 2021 Policy expressly confirms GlyMed's ability to modify its sales commission policy at its sole discretion: "the company may change or adjust the sales commission policy, which may

include: 1) commission rates; 2) commission rate tiers; 3) territory quotas; and 4) any other factor contributing to the calculation of sales commissions."

While Evans claims that the modification of her pay with respect to NB Aesthetics constituted a breach of the 2021 Policy, GlyMed asserts that in 2021 it verbally explained to Evans that it was treating NB Aesthetics differently because it was such a large client. There is no evidence that Evans objected or otherwise refused to accept this policy. Evans also had full access to sales data in her territory and information regarding the calculation of her commissions throughout this time. Despite having all this information, Evans did not raise any issue with how GlyMed calculated commissions on NB Aesthetic sales. Because there is evidence that the 2021 Policy allowed GlyMed to change rates at its sole discretion and it informed Evans of its change, there is at least a dispute of fact as to whether the parties modified the terms of the 2021 Policy with respect to commissions relating to NB Aesthetics. Because when viewing the evidence in the light most favorable to GlyMed there are questions of fact regarding contract modification on the rate changes for large clients, summary judgment on the interpretation and breach of the 2021 Policy is denied.

Finally, Evans argues that GlyMed also breached the 2021 Policy by not paying her for half of her commissions in November 2021. Evans nurtured her accounts and teed up sales to continue while she was on leave from childbirth. While taking approximately four weeks of leave after the birth of her child, Evans continued to be responsive to inquiries and requests related to her work. Evans' work leading up to her leave also resulted in hundreds of thousands of dollars in sales orders being completed in her territory during her leave. According to the terms of the 2021 Policy, Evans should have been paid for all of those commissions regardless of whether she was on leave. Unlike hourly employees, non-hourly commission-based employees

are entitled to their full compensation pursuant to the terms of the agreement. In these situations, the parties' agreement controls. The agreement does not have provisions regarding whether Evans was required to be in the office to earn commissions. Evans asserts that failing to pay all the commissions she earned was a breach of the 2021 Policy as a matter of law.

GlyMed, however, argues that Evans was not entitled to any commissions while she was on unpaid leave. GlyMed contends that it offers both paid time off and unpaid leave. Once paid time off is exhausted, employees such as Evans may take unpaid leave pursuant to the Unpaid Personal Leave policy. During November 2021, GlyMed contends that Evans was on unpaid leave pursuant to the Unpaid Personal Leave policy and was not entitled to any payments—commission or otherwise. GlyMed argues that there is a leave policy that governs this issue, but the court has already found that there is a question of facts as to whether Evans's supervisor granted Evans paid maternity leave. If she was granted paid leave, then GlyMed appears to concede that she would be entitled to her full commissions in November. Therefore, a question of fact precludes summary judgment on this claim. The court finds that summary judgment on the interpretation and breach of the 2021 Policy with respect to payment of Evans's November commissions is inappropriate and, therefore, denied.

### GlyMed's Motion in Limine re: Unrelated Discriminatory Acts

GlyMed argues that this court should exclude Evans's proffered testimony of a former employee who has subsequently filed her own, unrelated sexual harassment claims against GlyMed. Seven months after the close of fact discovery, with dispositive motions pending, Evans submitted a supplemental disclosure stating that she intends to call Nikki Helferich to testify about her own claims of discrimination. Evans states she recently learned for the first time that Nikki Helferich, her former co-worker and supervisor, is alleging discriminatory treatment

by McDaniel. Helferich also claims to have knowledge of a great deal of other complaints of discrimination between 2009 and 2024. Evans claims that this information should have been disclosed by GlyMed in discovery in response to Evans' written discovery requests.

The Supreme Court has stated that evidence of other discriminatory conduct in employment discrimination cases is not "*per se* admissible or *per se* inadmissible." *Sprint/United Mgmt. Co. v. Mendelsohn*, 522 U.S. 379, 388 (2008). The question of whether evidence of other discriminatory conduct is relevant is fact based and depends on many factors. Evidence of other discriminatory conduct is relevant to support an inference of discriminatory motive or intent, an essential element of an employment discrimination claim. While the conduct differs from this case, it is the same decision-maker, McDaniel. Evans claims that Helferich's testimony is relevant to McDaniel's allegedly deep-rooted, ongoing pattern of discriminatory conduct in statements and treatment of female subordinates at GlyMed.

Evans intends to have Helferich testify about a 2024 incident in which Helferich alleges that McDaniel used her hotel room at a work event to change his clothes, left chocolate on her pillow, told other female subordinates about what he had done, and then told her female coworkers that he needed to leave the event early to have sex with his fifth wife, who was their co-worker at GlyMed, all because Helferich rebuffed his advances. This is the main focus of Helferich's case against GlyMed and McDaniel. But in connection with it, she also asserts that she became aware of numerous allegations of McDaniel making sexually charged statements to women at GlyMed between 2009 and 2016, two allegations of McDaniel sexually harassing two GlyMed employees around 2016, of McDaniel engaging female subordinates in conversation about their female coworkers' sex lives, sex appeal, and sexual attraction to McDaniel between 2021 and 2024, of McDaniel's elevation and advancement of a female subordinate who was

21

receptive to his advances in 2021 and 2022 and his boasts about their sexual intimacy to other female subordinates in 2024.

However, the court has concerns that the claimed testimony is unrelated to the present case. This case relates to nonpayment of commissions during maternity leave. Relevant evidence must involve the same type of discrimination during the same time period and be under similar circumstances. Helferich's claims pertain to different types of inappropriate, sexually charged comments and conduct and a hostile work environment stemming from events that happened years after Evans left GlyMed. Evans cannot credibly claim that every bad thing McDaniel has ever done to a woman in the workplace is relevant to her case.

Evans recognizes that evidence of incidents occurring after a plaintiff's separation cannot be used to support a hostile work environment claim, but she argues that it could be relevant to motive, intent, or pretext. She claims that McDaniel treated women based on their sexual availability. Thus, she appears to be claiming that a pregnant woman would not be treated well because he viewed her as sexually unavailable. That is a lot of conjecture and speculation. The court does not agree that McDaniel's entire string of sex-based discrimination is relevant to whether he had the motive and intent to withhold Evans's commissions during maternity leave.

Evans claims that her supplement to the initial disclosures was justified because she recently learned of the other lawsuit, but GlyMed's failure to disclose Helferich's knowledge during discovery was not appropriate. In response to Evans' interrogatory asking GlyMed to describe every formal or informal complaint of discrimination, retaliation, or harassment between 2013 and 2023, GlyMed disclosed only Vidal's complaint that she, like Evans, was not paid her full commissions during her maternity leave. Evans performed extensive discovery regarding the incident with Vidal. But Evans did not have an opportunity to perform similar

discovery about any other discriminatory incidents because GlyMed did not disclose any. GlyMed knew or should have known of all the complaints Helferich claims occurred and should have disclosed them so it could be determined whether they were in fact relevant. The discovery standard is more broadly whether information could lead to admissible evidence.

GlyMed argues that Evans improperly imputes Helferich's knowledge to GlyMed, who she claims is at fault for not disclosing the information. It is unclear whether GlyMed has knowledge of discriminatory complaints or if Helferich is offering testimony of incidents that were not reported through official GlyMed channels. Even if GlyMed had knowledge of some of Helferich's allegations, it asserts that it had no duty to supplement its discovery responses because her allegations are not relevant to this lawsuit. The court agrees that Helferich's testimony of events occurring after Evans's tenure at GlyMed is not relevant to the present case because it is not sufficiently similar to the conduct at issue here or relevant to the timeframe of this case.

While Evans claims that Helferich has information regarding discrimination reaching back to Evans's tenure, that assertion is too vague for the court to consider. Evans has not submitted specific evidence to the parties or court from which the court can determine its relevance to the present case. If Helferich has specific evidence of similar discrimination during the time frame of Evans's pregnancy-related claims, Evans needs to disclose that evidence. The court can then consider whether it is willing to accommodate discovery on the allegations prior to trial. The supplementation of evidence is being done very late in the case. The court recognizes that Evans claims to have also just learned of the evidence, but the evidence needs to not only be contemporary to her time at GlyMed but also similar in nature. Evans's claim of being treated unfairly with leave is not sufficiently related to inappropriate, sexually charged

comments and conduct for such comments and conduct to be relevant to the leave dispute. Evans does not claim that McDaniel treated her in that way and the notion that McDaniel is generally anti-woman if he views the woman as sexually unavailable is too generalized and speculative.

While the court is not imposing a blanket exclusion of all testimony from Helferich, testimony related to Helferich's lawsuit claiming sexual harassment is excluded as irrelevant and outside the relevant time period. In addition, the court finds that evidence of sexually charged comments and conduct are not relevant to whether McDaniel had an intent or motive to withhold Evans's commissions because she took maternity leave. If Evans has evidence from Helferich of similar discrimination during the time frame of Evans's pregnancy-related claims, the specific evidence must be disclosed as soon as possible, and the court will determine if the parties can conduct discovery on it before trial. Therefore, GlyMed's motion in limine seeking to preclude testimony of unrelated discriminatory comments and conduct is granted but a blanket exclusion of testimony from Helferich is denied. Therefore, the motion is granted in part and denied in part.

## CONCLUSION

Based on the above reasoning, Defendant Glymed Plus LLC's Motion for Partial Summary Judgment [ECF No. 36] is DENIED; Plaintiff's Motion for Partial Summary Judgment Regarding Plaintiff's Contract Claims [ECF No. 38] is DENIED; and Defendant's Motion in Limine to Exclude Testimony Regarding Unrelated Discriminatory Acts [ECF No. 51] is GRANTED IN PART AND DENIED IN PART. Within fifteen days of the date of this Order, the parties shall meet and confer and submit a joint notice with the court as to when they will be ready for trial. The court will then review its trial schedule and notify the parties of specific trial dates that are available. The court will issue a Trial Order with pre-trial deadlines approximately

ten weeks prior to trial.

DATED this 20th day of January 2026.

BY THE COURT:

DALE A. KIMBALL
UNITED STATES DISTRICT JUDGE